UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| SILVER FOAM DISTRIBUTING CO., a/k/a SILVER FOAM REDISTRIBUTION CENTER, | |
| Plaintiff, | Case No. 20-10681 Honorable Laurie J. Michelson |
| v. | |
| LABATT BREWING TRADING COMPANY, LTD., f/k/a SABMiller CANADA, | |
| Defendant. | |

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [12]

SABMiller Canada (Miller) wanted to ship Miller Lite, Miller Genuine Draft, and other beers from the United States to Canada. To accomplish this international distribution, Miller entered into a five-year Service Agreement with Silver Foam Distributing Company; under the Agreement, Silver Foam would co-pack and repalletize Miller's beers for shipment to Canada. To handle this job, Silver Foam bought nearly $1 million in automation equipment and made other investments. Things went according to plan for a short time. But then, Miller's parent company sold the beer brands covered by the Agreement. As Miller no longer had the rights to sell the brands in Canada, Miller stopped using Silver Foam's services. At that time, there were still over two years left on the five-year term.

So Silver Foam filed this suit against Miller. It insists that the parties entered into a requirements contract. But if that is true, Miller could stop using Silver Foam's services so long as it did so in good faith. As Silver Foam's complaint does not adequately plead that Miller failed

to act in good faith (and, in fact, suggests just the opposite), the Court will GRANT Miller's motion to dismiss.

**I.**

**A.**

Because Miller seeks dismissal under Federal Rule of Civil Procedure 12(b)(6), the Court accepts the factual allegations in Silver Foam's complaint as true and draws reasonable inferences from those allegations in Silver Foam's favor. *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020).

Silver Foam is located in Jackson, Michigan. (ECF No. 1, PageID.1.) It "provides distribution, logistics, warehousing, and customized solutions to customers . . . throughout North America." (ECF No. 1, PageID.1.)

In 2013, Defendant SABMiller Canada (Miller) obtained the legal right to market certain beer brands, including Miller Lite, in Canada. (ECF No. 1, PageID.3.) To sell beer in Canada, Miller needed help with "co-packing the beer for international shipment" and turned to Silver Foam for help. (*Id.*) Miller also needed "advanced and costly automation equipment" to pack beer for Canada (*Id.*) Justin Varga, then Miller's manager for international logistics, "prepared specifications and drawings for this new automated equipment to be installed at Silver Foam's facilities in Jackson, Michigan." (*Id.*) But after a price quote revealed that the equipment was expensive, Miller decided it was in its interest to not own the equipment. (*Id.*)

So Varga, on behalf of Miller, informed Silver Foam that due to financial reporting concerns, it did not want to buy the automation equipment and it wanted Silver Foam to do so. (ECF No. 1, PageID.3.) Varga or other Miller employees told Silver Foam that this arrangement would allow Silver Foam to efficiently handle "the expected increased volume of product from

launching Miller Lite brand beer into Canada." (*Id.* at PageID.4.) In addition to asking Silver Foam to buy this automation equipment for Silver Foam's Jackson, Michigan location, Miller wanted Silver Foam to open a foreign trade zone warehouse in Indiana; this would allow beer to be shipped by "heavy loaded" rail to Canada. (*Id.* at PageID.5.) Because Miller knew that Silver Foam would incur great expense in buying the automation equipment, Miller said that it would sign an agreement to protect Silver Foam. (*Id.* at PageID.4.) In particular, Miller indicated it would agree to compensate Silver Foam in the event that Miller did not use enough of Silver Foam's services for Silver Foam to recoup the equipment costs. (*Id.* at PageID.4.)

The two companies proceeded with their plan, and in December 2014, Silver Foam and Miller executed a "Service Agreement." (ECF No. 21.) Because the Agreement is at the heart of the parties' dispute in this case, the Court describes several of its provisions in some detail.

The Agreement described Silver Foam's services and what Miller would pay for those services. Under the Agreement, Miller "desire[d] to purchase" from Silver Foam, and Silver Foam "desire[d] to provide" to Miller, "each of the Services as more fully set forth" in Schedule A. (Agreement § 1(a).)[1] The Agreement also acknowledged that Silver Foam "intend[ed] to invest in material handling automation equipment," and that "upon installation" of that equipment, the services in Schedule A would transition "to volume based pricing as set forth on Schedule B." (Agreement § 1(c).) In turn, Schedule B provided that for the Michigan location, the "estimated case volume" for the first year would be about 1.6 million at a rate of $0.24 per case. In "Year 2," the numbers were 2.2 million and $0.21, respectively. Schedule B provided estimated case

---

[1] This District's normal citation format is "ECF No. x, PageID.y." In this case though, precise references to contract provisions will make it easier for the parties, the public, and any reviewing court to understand this Court's resolution of the pending motion. A copy of the entire agreement—which is not long—is ECF No. 21-1, and, for convenience, a copy is an appendix to this opinion.

volumes and rates through "Year 5." (Although there were ways for the parties to terminate the agreement early, the Agreement expired by its own terms in March 2019. (*See* Agreement § 1(b).)) For the Indiana location, Schedule B provided that in "Year 1" the cost per inbound pallet would be $20 and that after the first year, the cost would be based on volume. Although Schedule B provided "estimated case volume[s]," the Agreement also provided that by January 30 of each year, the parties would "align on forecasted volumes and the pricing scale to utilize for the new fiscal year as contained in Schedule B." (Agreement § 1(e).)

Aside from the payment schedule shifting from Schedule A to Schedule B after installation of the automation equipment, the Agreement also provided that once that equipment was installed, certain clauses would survive two types of termination of the Agreement. (Agreement § 2(c).) To be more precise, "After installation of . . . automation equipment by [Silver Foam,] . . . penalty clauses for early termination by [Miller] as set forth in Schedule C & Schedule D will survive in the event of a termination effectuated by [Miller] . . . pursuant to Section 2(a)(iii) or a termination effectuated by [Silver Foam] . . . pursuant to Section 2(a)(ii) default by [Miller]." (Agreement § 2(c).) Restated, once the equipment was installed, penalty clauses would survive if Miller terminated the Agreement pursuant to § 2(a)(iii) or Silver Foam terminated it pursuant to § (2)(a)(ii). Thus, to understand when the penalty clauses would survive, a description of § 2(a)(ii) and § 2(a)(iii) is in order.

Under § 2(a)(ii), "the occurrence and continuation of a Default . . . pursuant to Section 2(d)" would terminate the Agreement. In turn, § 2(d) provided three ways for a party to default. The first was if a party filed for bankruptcy (or made like arrangements for its creditors). (Agreement § 2(d)(i).) The second was if Miller failed to make a timely payment to Silver Foam, provided that the failure continued for 30 days and that Silver Foam gave written notice to Miller.

(Agreement § 2(d)(ii).) And the third was a party's failure to perform "a material term under this Agreement," provided that the failure continued for 150 days after written notice of the failure from the other party. (Agreement § 2(d)(ii).) In other words, upon installation of the automation equipment, the penalty clauses would survive termination if Miller defaulted by going into bankruptcy (or the like), failed to timely pay after receiving written notice, or failed to perform a "material term" after receiving written notice.

The other way for the penalty clauses to survive the Agreement's termination was if Miller terminated pursuant to § 2(a)(iii). Under § 2(a)(iii), termination occurs 30 days after "delivery . . . of a written demand for termination of [the] Agreement without cause."

Schedule C and Schedule D set out the penalty clauses for Michigan and Indiana, respectively. For the Michigan location, if the contract duration was only a year, the penalty was about $696,000; if the duration was two years, about $455,000; and the penalties continued to decrease as the contract duration increased. (*See* Agreement Schedule C.) For the Indiana location, the penalty amounts were similar and also decreased as the contract duration increased. (*See* Agreement Schedule D.)

Although Miller and Silver Foam signed the Agreement in December 2014, the automation equipment was not installed until May 2016. (ECF No. 1, PageID.8.) The equipment cost Silver Foam over $900,000. (ECF No. 1, PageID.4.) Silver Foam also hired and trained "dozens" of additional employees to handle the increased volume of beer-related co-packing and repalletization. (*See* ECF No. 1, PageID.5.) And, as contemplated, Silver Foam incurred costs in setting up the foreign trade zone in Indiana: it hired attorneys to research the rules for an FTZ, signed a long-term lease in Indiana, and purchased forklifts and warehouse equipment. (*Id.*)

Eventually Silver Foam was set up and ready to handle the services contemplated by the Agreement. And from about May 1, 2016 until October 2016, "[t]he parties performed under the Agreement without incident." (ECF No. 1, PageID.8.)

But that did not last. Sometime around October 2016, Miller's parent company, Anheuser-Bush InBev SA/NV, sold the beer brands covered by the Agreement to Molson Coors. (ECF No. 1, PageID.8.) This sale resulted in Miller losing the "Canadian rights to the relevant beer brands." (*Id.*) Thus, Miller "was rendered incapable of performing under the Agreement." (*Id.*) Indeed, after the October 2016 sale of the brands, Miller never again used Silver Foam's services. (ECF No. 1, PageID.9.) Miller's "volume fell to zero under the Agreement." (*Id.*) And, recall, that unless one of the parties invoked one of the termination provisions, the Agreement's expiration date was not until March 31, 2019. (Agreement § 2(b).) In other words, there was about two-and-half years left of the five-year agreement when Anheuser-Bush sold the beer brands to Molson Coors.

For a time, Silver Foam mitigated its damages by doing similar business with the new owner of the Canadian rights, Molson Coors. (ECF No. 1, PageID.9.) But in September 2017, Molson Coors decided that it would begin brewing the relevant beer brands in Canada, and so it no longer needed Silver Foam's services. (*Id.*)

At least by May 21, 2018, possibly earlier, Silver Foam provided Miller with "written notice of a failure to pay an amount due and of a material breach of the Agreement, namely, the breach of the termination clause and the requirements provisions." (ECF No. 1, PageID.14.) Miller did not resume business with Silver Foam or otherwise correct what Silver Foam claimed to be a material breach. (*Id.*) Nor did Miller pay the penalty clause amounts in Schedule C or Schedule D of the Agreement. (*Id.*)

6

**B.**

This lawsuit followed. Silver Foam's complaint alleges that Miller breached the Agreement in three ways. According to Silver Foam, the Agreement was a requirements contract, requirements contracts include a duty to perform in good faith, and by reducing its requirements to zero, Miller did not act in good faith. (ECF No. 1, PageID.10.) Silver Foam also claims that Miller rendered itself incapable of performance and therefore terminated the Agreement but never provided written notice of that termination as required by § 2(a)(iii). (ECF No. 1, PageID.12.) Failure to provide written notice of termination is a second breach. Silver Foam claims that Miller breached a third way too: by not paying the penalties as set out in Schedules C and D. (ECF No. 1, PageID.13.) Finally, as a fourth count, Silver Foam brings a claim of promissory estoppel. (ECF No. 1, PageID.15.) (Silver Foam had another count but agreed to dismiss it. (ECF No. 17.))

Miller now moves to dismiss Silver Foam's complaint in its entirety. (ECF No. 12.)

**II.**

In deciding a motion to dismiss under Rule 12(b)(6), the Court "construes the complaint in the light most favorable" to Silver Foam and determines whether its "complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). What is plausible is "a context-specific task" requiring this Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III.

## A.

Before turning to the four counts of the complaint and Miller's efforts to dismiss them, there is a threshold issue to address.

Silver Foam says that the Agreement is a requirements contract; Miller says it is not. "A requirements contract is one in which the quantity term is not fixed at the time of contracting [and t]he parties agree that the quantity will be the buyer's needs or requirements of a specific commodity or service over the life of the contract." *J&B Sausage Co. v. Dep't of Mgmt. & Budget*, No. 259230, 2007 WL 28409, at *3 (Mich. Ct. App. Jan. 4, 2007) (internal quotation marks omitted). In other words, the buyer agrees to purchase "all or some" of its needs for a good or service from the seller. *See Gen. Motors Corp. v. Paramount Metal Prod. Co.*, 90 F. Supp. 2d 861, 874 (E.D. Mich. 2000). In Miller's view, the Agreement does not fit that description. Miller says that the Agreement merely set the terms—e.g., pricing and services—that would govern *if* it used Silver Foam's services; but the Agreement did not obligate it to use any of Silver Foam's services. (ECF No. 12, PageID.63–64; ECF No. 20, PageID.169.) For its part, Silver Foam both pleads and argues that the Agreement is a requirements contract. (ECF No. 1, PageID.7; ECF No. 15, PageID.131.) Silver Foam says, "[t]he Agreement specifically states in at least two places . . . that SABMiller would purchase various services from Silver Foam 'as required' by SABMiller." (ECF No. 15, PageID.131; *see also* ECF No. 21-1, PageID.176.)

Ultimately, the Court need not resolve this dispute. Instead, it will assume in Silver Foam's favor that the Agreement is a requirements contract. The Court may make this assumption because even granting Silver Foam that premise, Silver Foam's claims of breach are not plausible.

**B.**

Proceeding under the assumption that the Agreement is a requirements contract, the Court turns to Miller's efforts to dismiss Count I of the complaint.

In Count I, Silver Foam alleges that Miller breached the Agreement by setting its requirements to zero. (ECF No. 1, PageID.10–11.) Regarding the law, Silver Foam argues that "[u]nder a requirements contract, the parties are expected to act ['] in good faith and according to commercial standard of fair dealing in the trade.'" (ECF No. 15, PageID.135 (quoting *Gen. Motors Corp. v. Paramount Metal Prod. Co.*, 90 F. Supp. 2d 861, 873 (E.D. Mich. 2000)).) Regarding the facts, Silver Foam points out that Miller knew Silver Foam was purchasing expensive automation equipment. (ECF No. 15, PageID.128, 132.) And the parties estimated millions of cases per year for five years. (*See id.* at PageID.136.) Yet just five or so months after Silver Foam installed the automation equipment, Miller stopped ordering any cases. (*Id.*) Applying the law to the facts, Silver Foam argues that Miller breached its duty to act in good faith. (*Id.* at PageID.135–136.)

Silver Foam's argument ignores ample case law giving special meaning to the term "good faith" in the context of a requirements contract. (In fairness to Silver Foam, Miller did not cite any of this law, either, because it took the position that the Agreement was not a requirements contract.) In the requirements contracts setting, it is not necessarily bad faith for a buyer to set its requirements to zero.

Although hardly the first to articulate this rule of law, *Empire Gas Corp. v. American Bakeries Co.* is often cited for it. There, the Seventh Circuit analyzed the Uniform Commercial Code provisions governing requirements contracts. The court concluded that the UCC treated a buyer's drastic decrease in its requirements differently from a buyer's drastic increase in its requirements. 840 F.2d 1333, 1337–38 (7th Cir. 1988). As to a drastic increase, the buyer might

9

breach if its increase is "unreasonably disproportionate to any stated estimate." *Id.* at 1338. But as to a drastic decrease, a buyer is allowed "to reduce his requirements to zero if he was acting in good faith, even though the contract contained an estimate of those requirements." *Id.*

Numerous federal appellate courts have followed *Empire Gas* and adopted the rule that a buyer does not necessarily breach a requirements contract if it sets its requirements to zero. *See Atl. Track & Turnout Co. v. Perini Corp.*, 989 F.2d 541, 544 (1st Cir. 1993) (adopting rationale of *Empire Gas*); *Tigg Corp. v. Dow Corning Corp.*, 962 F.2d 1119, 1126 (3d Cir. 1992) (citing *Empire Gas* and stating, "a requirements buyer may have a good faith reason for demanding no goods from the seller. In such a case, the buyer does not breach by ordering no goods."); *Brewster of Lynchburg, Inc. v. Dial Corp.*, 33 F.3d 355, 365 (4th Cir. 1994) ("We find the reasoning in *Empire Gas* persuasive . . . . [A] requirements contract allows a buyer to reduce the quantity demanded to any amount, including zero, so long as it does so in good faith."); *Wiseco, Inc. v. Johnson Controls, Inc.*, 155 F. App'x 815, 818 (6th Cir. 2005) (noting that *Empire Gas* "appears to be the most frequently consulted case in analyzing the good faith component of a requirements contract under the U.C.C."); *Bright Harvest Sweet Potato Co., Inc. v. H.J. Heinz Co., L.P.*, 760 F. App'x 537, 540 (9th Cir. 2019) ("The district court properly looked to the good faith standard set forth in *Empire Gas*."); *Tech. Assistance Int'l, Inc. v. United States*, 150 F.3d 1369, 1373 (Fed. Cir. 1998) (citing *Empire Gas* and noting "the long line of cases that have permitted buyers to discontinue their businesses and thereby eliminate their requirements altogether, as long as they do so in good faith"); *see also Godchaux-Henderson Sugar Co. v. Dr. Pepper-Pepsi Cola Bottling Co. of Dyersburg*, 772 F.2d 906, 1985 WL 13561, at \*6 (6th Cir. Aug. 29, 1985) (unpublished table decision) ("[T]he majority of authorities have construed U.C.C. § 2–306(1) as permitting

good faith reductions in requirements, as opposed to increases, even though the reductions may be highly disproportionate to stated estimates.").

True, *Empire Gas* involved a requirements contract for goods, and thus the court was interpreting and applying the UCC. Neither party in this case thinks that their Agreement was for the sale of goods. And while the Court does not decide the issue, it tends to agree with the parties— the Agreement does seem like a contract for services rather than goods. *See J&B Sausage Co. v. Dep't of Mgmt. & Budget*, No. 259230, 2007 WL 28409, at *2 (Mich. Ct. App. Jan. 4, 2007). But at least in a case like this—where the contracted services involve packing goods for delivery and payment on a per-case basis—there is no sound reason to hold Miller to a different good-faith standard from the one supplied by *Empire Gas*. Silver Foam has not provided one at least.

And, in fact, history provides a good reason to not limit the *Empire Gas* standard to cases governed by the UCC. Decades before the UCC, the Supreme Court explained, "As, if it be agreed to furnish so many bushels of wheat, more or less, according to what the party receiving it shall require for the use of his mill, then the contract is not governed by the quantity named, nor by that quantity with slight and unimportant variations, but by what the receiving party shall require for the use of his mill." *Brawley v. United States*, 96 U.S. 168, 172 (1877). The Court added, "the variation from the quantity named will depend upon [the receiving party's] discretion and requirements, so long as [it] acts in good faith." *Id.*

Indeed, even the more specific rule—that a buyer can reduce its requirements to zero so long as the reduction is in good faith—was applied at common law. *In re United Cigar Stores Co. of Am.*, 72 F.2d 673, 675 (2d Cir. 1934) (applying rule in a pre-UCC decision); *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp.*, 130 F.2d 471, 473 (3d Cir. 1942) (applying rule in pre-UCC decision); *HML Corp. v. Gen. Foods Corp.*, 365 F.2d 77, 83 (3d Cir. 1966)

(applying rule where contract was not governed by the UCC); *Empire Gas*, 840 F.2d at 1337–38 (noting that at common law, "the seller assumes the risk of all good faith variations in the buyer's requirements even to the extent of a determination to liquidate or discontinue the business" (quoting *HML Corp.*, 365 F.2d at 81)). And at least one appeals court has found that a buyer of services could reduce its requirements to zero so long as it acted in good faith. *Tech. Assistance Int'l, Inc. v. United States*, 150 F.3d 1369, 1372–73 (Fed. Cir. 1998) (applying federal common law and "hold[ing] that the only limitation upon the government's ability to vary its requirements under a requirements contract is that it must do so in good faith").

Thus, to sum up so far, courts across the country applying the UCC and common law have found that a buyer does not breach a requirements contract by setting its requirements to zero—so long as zero is the buyer's good-faith requirement. When courts largely speak in one voice, that is highly persuasive. And Silver Foam has not cited any authority to the contrary.

That said, the Agreement in this case is governed by Michigan law. (Agreement § 10(f).) So the real question is what does Michigan law have to say on the matter? As far as this Court can tell, the answer is "not much." Neither party has cited an opinion that both applies Michigan law and describes a buyer's good-faith duties under a requirements contract. And the Court's research has only uncovered two opinions applying Michigan law and finding that a buyer could not reduce its requirements to zero.

One is old. In *Hickey v. O'Brien*, Kreutzberger agreed to buy from Lucas "all the ice necessary to carry on [Kreutzberger's] business in [Saginaw, Michigan] for the period of five years." 82 N.W. 241, 242 (Mich. 1900). But the parties only performed under the contract for about a year and half, at which point Kreutzberger (the buyer) sold its property to a third-party. *Id.* The Michigan Supreme Court stated, "we think the true construction [of the contract] is that

12

[Kreutzberger] undertook to take ice of Lucas & Co. for the period of five years; that the quantity which they agreed to take was to be measured by the necessities of their business, but that this presupposed that they would have a business for the time agreed." *Id.* at 243. Thus, Kreutzberger was bound to take ice for the "stated time." *Id.* at 242.

While *Hickey* seems helpful to Silver Foam, a lot changes in 120 years. In *Hickey*, the Michigan Supreme Court followed *National Furnace Co. v. Keystone Manufacturing Co.*, 110 Ill. 427 (1884). But "in early cases, like . . . *National Furnace*, the courts found it necessary to impose a duty on buyers to continue their businesses and purchase approximately the same quantity from the sellers as when the contract was first entered into, in order to establish a mutuality of duties sufficient to validate the requirements contract." *Schawk, Inc. v. Donruss Trading Cards, Inc.*, 746 N.E.2d 18, 22 (Ill. Ct. App. 2001); *see also id.* at 23 ("[W]e read these pre-UCC decisions today as standing for the principle that a buyer may not terminate its requirements in bad faith, rather than as imposing a duty to remain in business."); *see also* Mich. Comp. Laws § 440.2306 cmt. 2 (providing that a requirements contract does not lack mutuality of obligation because the buyer must determine quantity "in good faith and according to commercial standards of fair dealing in the trade so that his . . . requirements will approximate a reasonably foreseeable figure.").

Unlike in *Hickey*, this Court need not impose a duty on Miller to continue its business for five years for the Agreement to have mutuality of obligation. Assuming that the Agreement was a requirements contract (which, again, Silver Foam insists that it is), Miller was obligated to buy what its business "requir[ed]"—not whatever Miller "want[ed]." *See Empire Gas*, 840 F.2d at 1339 ("'Requirements' are more than purely subjective 'needs,' which would be the equivalent of 'wants.'"). In any event, *Hickey* appears to have involved a contract for the sale of goods (ice), and so its rule has likely been replaced by the good-faith rule in Michigan's version of the UCC. *See*

13

Mich. Comp. Laws § 440.2306 cmt. 2 ("The essential test is whether the party is acting in good faith.").

In its research, the Court came across a second opinion applying Michigan law to a situation where the buyer's requirements dropped to zero. In *Metal One America, Inc. v. Center Manufacturing., Inc.*, the buyer, after placing a large order, suddenly closed its plant and did not buy any more goods from the seller. No. 1:04-CV-431, 2005 WL 1657128, at *2–3, 7 (W.D. Mich. July 14, 2005). This resulted in the seller being stuck with a large inventory of raw materials. *Id.* at *7. In finding that the buyer acted in bad faith in refusing to operate the plant and fill its requirements, the *Metal One* court relied on the following language from a UCC comment: "A shut-down by a requirements buyer for lack of orders might be permissible when a shut-down merely to curtail losses would not." *Id.* at *7 (quoting Mich. Comp. Laws § 440.2306 cmt. 2). Although the *Metal One* buyer's requirement of zero was not in good faith, the good-faith standard the court applied was still the one provided by the UCC for requirements contracts—the very one interpreted by *Empire Gas*.

Thus, having canvassed the precedent, the Court will apply the widely adopted rule: Miller could reduce its purchases to zero—so long as it did so in good faith.

But what, exactly, is "good faith"? Although the line dividing good and bad faith is not bright, precedent draws the line well enough to decide this case.

In *Empire Gas*, American Bakeries contracted with Empire Gas for devices that would convert the bakery's 3,000 vehicles from running on gasoline to running on propane (apparently propane was cheap at the time). 840 F.2d at 1335. But "within days after the signing of the contract American Bakeries decided not to convert its fleet to propane." *Id.* The Seventh Circuit explained, "Clearly, American Bakeries was acting in bad faith if during the contract period it bought propane

14

conversion units from anyone other than Empire Gas, or made its own units, or reduced its purchases because it wanted to hurt Empire Gas (for example because they were competitors in some other market)." *Id.* at 1339. The court continued, "Equally clearly, [American Bakeries] was not acting in bad faith if it had a business reason for deciding not to convert that was independent of the terms of the contract or any other aspect of its relationship with Empire Gas, such as a drop in the demand for its bakery products that led it to reduce or abandon its fleet of delivery trucks." *Id.* Because American Bakeries refused to order the conversion units only days after signing the contract, and because it never gave any reason for backing out of the contract (despite multiple opportunities to do so), the only fair inference was that it did so on a whim or because of buyer's remorse. *See id.* at 1341. Either way, that was bad faith. *See id.*

The Sixth Circuit's decision in *Wiseco, Inc. v. Johnson Controls, Inc.*, also helps draw the good-faith-bad-faith line. In summarizing the case law, our Court of Appeals stated, "The First Circuit had found no bad faith when a buyer chose to shut down an unprofitable manufacturing plant and ended its requirements under a supply contract as a result." 155 F. App'x 815, 818 (6th Cir. 2005) (citing *Brewster of Lynchburg, Inc. v. Dial Corp.*, 33 F.3d 355, 366 (4th Cir. 1994)). The Sixth Circuit added, "To like effect, several other cases have found no bad faith for reducing and eliminating orders where the buyer wanted to reduce existing inventory, where an existing operation had become more efficient, where the buyer's customers no longer required the product or where a part was needed less than expected." *Id.* (citations omitted). And referring to *Empire Gas*, the Sixth Circuit stated, "the buyer does not act in bad faith if it reduced its requirements for 'business reasons . . . independent of the terms of the contract or any other aspect of its relationship with the [seller].'" *Id.* (quoting *Empire Gas*, 840 F.2d at 1339); *accord Brewster*, 33 F.3d at 366 ("[I]f the buyer had a legitimate business reason for eliminating its requirements, as opposed to a

15

desire to avoid its contract, the buyer acts in good faith." (internal quotation marks and citation omitted)).

Gauged by these standards, this is not a hard case. The complaint states, "The parties performed under the Agreement without incident until in or around October, 2016." (ECF No. 1, PageID.8.) Then, "[Miller's] parent company, Anheuser-Busch InBev SA/NV . . . sold the beer brands covered by the Agreement to Molson Coors Brewing Company." (*Id.*) "Through this sale of brands," Silver Foam alleges, "[Miller] was rendered incapable of performing under the Agreement, because [Miller] no longer had the Canadian rights to the relevant beer brands." (*Id.*) Thus, "[a]fter this sale of brands, [Miller's] volume fell to zero under the Agreement." (*Id.* at PageID.9.) This is a quintessential legitimate business reason. There is no hint of bad faith in these allegations. As far as the Court can tell, the decision to sell the beer brands covered by the Agreement had nothing to do with the Agreement or Silver Foam. Indeed, it was not even Miller's decision to sell the brands—it was Anheuser-Busch's. It is Silver Foam's burden to show bad faith, and absent that showing, "the buyer will be presumed to have varied its requirements for valid business reasons, i.e., to have acted in good faith." *Tech. Assistance Int'l, Inc. v. United States*, 150 F.3d 1369, 1373 (Fed. Cir. 1998); *see also Wiseco*, 155 F. App'x at 818 (providing that seller has burden of showing bad faith). Thus, the allegations in the complaint do not make it reasonable to infer that Miller acted in bad faith in reducing its requirements to zero.

Lastly, the Court notes that neither party cites any governing case indicating that Silver Foam's substantial up-front investment modifies the usual good-faith standard.

And, in fact, there are at least two good reasons why it should not. For one, a seller entering a requirements contract is always free to negotiate for a minimum purchase each month (or year) for the life of the contract. *See Brewster*, 33 F.3d at 365 ("If the seller wishes to reallocate some

16

of the inherent risks in such a contract, it may specify some minimum requirement."); Notes, *Requirements Contracts: Problems of Drafting and Construction*, 78 Harv. L. Rev. 1212, 1220 (1965) ("[C]ourts have generally permitted a buyer to cut back his orders sharply if there is a bona fide decrease in his needs; they suggest that had the seller intended a contrary result, he could have protected himself by providing a minimum limitation on quantity."). Silver Foam apparently did not negotiate for a minimum quantity, or, if it did, Miller did not agree to it. Second, in *Wiseco*, the seller there also invested so that it could fill the buyer's requirements. 155 F. App'x at 816 ("Wiseco 'tooled-up' for the production, which is to say it bought and prepared equipment to handle the manufacturing work."). Despite the seller's investment, the Sixth Circuit found that because the buyer had a good faith reason for reducing its requirements to zero, the buyer did not breach. *Id.* at 819.

In sum, if, as Silver Foam has asserted, the Agreement is a requirements contract, then Miller was allowed to reduce its requirements to zero so long as it did so in good faith. Because the allegations in the complaint do not imply bad faith, but instead imply that Miller "reduced its requirements for 'business reasons . . . independent of the terms of the contract or any other aspect of its relationship with [Silver Foam],'" *Wiseco*, 155 F. App'x 815, 818 (quoting *Empire Gas*, 840 F.2d at 1339), Count I must be dismissed.

## C.

The Court turns to Miller's efforts to dismiss Count II of Silver Foam's complaint. There, Silver Foam claims that Miller breached § 2(a)(iii) of the Agreement by failing to provide written notice of termination. (ECF No. 15, PageID.137; *see also* ECF No. 1, PageID.12.)

Silver Foam's claim rests on two key premises. One is that the sale of the beer brands, coupled with Miller's volume dropping to zero, meant that Miller actually or "constructively"

17

terminated the Agreement without cause. (ECF No. 15, PageID.137.) The other premise is that "under Section 2(a)(iii) of the Agreement, SABMiller was required to give Silver Foam written notice of this termination." (*Id.*) Miller never did, and so Silver Foam claims breach. (*Id.*)

Both of Silver Foam's premises are faulty.

Consider first Silver Foam's premise that "under Section 2(a)(iii) of the Agreement," Miller was required to send Silver Foam written notice of termination once the brands were sold and Miller stopped ordering. Section 2(a)(iii) reads as follows: "(a) The term ('Term') of this Agreement shall commence on the date hereof and continue until, the earliest of the following to occur: . . . (iii) the delivery by either party of a written demand for termination of this Agreement without cause, provided such demand shall not be effective for at least (30) days following its delivery to either party pursuant to section 10(b), and 2(c)." To restate, § 2(a)(iii) says that one way for the agreement to terminate is for one party to deliver to the other a written demand for termination without cause. Silver Foam wants § 2(a)(iii) to say that if a party decides to terminate without cause (or its actions indicate that it has done so), the party must deliver a written demand for termination. But all that § 2(a)(iii) says is that delivery of the demand terminates the Agreement—§ 2(a)(iii) is a means for termination, not an obligation upon termination.

Silver Foam has also failed to establish its second premise, that Miller terminated without cause. Silver Foam points to no language in the Agreement providing that Miller's inability or failure to use Silver Foam's services terminates the Agreement. The section of the Agreement dealing with "Term and Termination of Agreement" provides that the Agreement "shall continue" until one of four events occurs: (1) a mutual, written agreement to terminate, (2) a default as defined in § 2(d), (3) delivery of a written demand for termination without cause, or (4) the calendar turns to March 31, 2019. Setting aside a default as defined in § 2(d) for one moment, the

other three items in that list do not include Miller's inability or failure to use Silver Foam's services. As for default, § 2(d) includes exactly three varieties: Miller's bankruptcy (or the like), a late payment by Miller (if certain other conditions are met), and Miller's "failure to perform a material term" of the Agreement (if the failure continues after written notice). The only type of default that might fit the facts is a "failure to perform a material term." But as explained in the prior section of this opinion, there was no agreed-upon minimum quantity, and Miller did not breach its duty of good faith by setting it requirements to zero. So Silver Foam has not shown that Miller failed to perform a material term, and the Agreement was not terminated that way, either. In short then, no language in the Agreement provides that Miller's inability to use Silver Foam's services results in the Agreement's termination.

And if Silver Foam is relying on case law (rather than the Agreement's language) to establish constructive termination, it has not provided the Court with any case indicating that a buyer dropping its requirements to zero amounts to termination of a requirements contract. (*See* ECF No. 15, PageID.137.) Indeed, Silver Foam's rule would negate the flexibility that requirements contracts are intended to grant buyers. *See Tech. Assistance Int'l, Inc. v. United States*, 150 F.3d 1369, 1371–72 (Fed. Cir. 1998) ("The buyer is likely to enter into [a requirements] contract when its needs are unpredictable and it wishes to preserve for itself the freedom to determine its level of consumption and to conduct its operations according to its best business judgment."); Notes, *Requirements Contracts: Problems of Drafting and Construction*, 78 Harv. L. Rev. 1212, 1215 (1965) ("The requirements contract is designed as a flexible arrangement: it is intended to give the buyer an assured source of supply over an extended period of time without obliging him to take a specified quantity, thus enabling him to meet the fluctuating needs of his business."). Consider a three-year requirements contract that includes an estimate of a million

cases per year; and suppose in year one, a buyer's requirements are (as anticipated) one million cases; but in year two, its requirements are zero (perhaps there is a trade embargo, part of the buyer's shop burns down, or any number of unforeseeable events); but by year three, the buyer's requirements are back to the normal one million cases. So long as each of the requirements—one million in year one, nothing in year two, and one million in year three—were all determined in good faith, the very nature of a requirements contract seems to permit a buyer to order in this up-and-down fashion. Yet, under Silver Foam's purported rule, the buyer would have terminated the agreement in year two. Having not been provided with a single case supporting that result, the Court declines to add a route to termination not provided for by the Agreement.

In a variation on a theme, Silver Foam alternatively argues that Miller breached the implied covenant of good faith and fair dealing by not delivering a written demand for termination without cause. (ECF No. 1, PageID.10; ECF No. 15, PageID.136.) Silver Foam points out that once the brands were sold, Miller did not (indeed, could not) perform under the Agreement. So the good-faith thing to do—in Silver Foam's view—was to send the written demand for termination under § 2(a)(iii).

On the surface, Silver Foam's argument has equitable appeal. In the Agreement, both parties acknowledged Silver Foam's substantial up-front costs and provided a means for Silver Foam to recoup those costs in the event of an early termination. (*See* Agreement § 2(c), Schedule C, Schedule D.) And the Agreement provided that one type of early termination was Miller's written demand for termination without cause. (*See* Agreement § 2(c).) So Miller was undoubtedly aware that if it sent the written demand to Silver Foam, the penalty clauses would kick in. Yet Miller, unable to use Silver Foam's services, simply sat back and waited for the Agreement to expire in March 2019. That does sound unfair. *See Hammond v. United of Oakland, Inc.*, 483

N.W.2d 652, 655 (Mich. Ct. App. 1992) ("It has been said that the covenant of good faith and fair dealing is an implied promise contained in every contract that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." (internal quotation marks omitted)).

But an unfair result is not synonymous with bad faith. As explained, a buyer enters into a requirements contract for flexibility—there may come a time during the contract's term when the buyer's business does not need the seller's services. True, a buyer can bargain away some of this flexibility. And in fact, Miller did that here: it agreed to pay a penalty for early termination. But it only agreed to pay the penalty for specific types of early terminations, including its delivery of a written demand for termination without cause. Miller did not agree to more than that. Silver Foam could have bargained to have the penalty clauses triggered if Miller could no longer use its services, but it did not do so; or if it did, Miller did not agree to those terms. So by allowing the Agreement to expire by its own terms, Miller merely exercised flexibility that it had preserved for itself in the Agreement. That is not bad faith.

Because no language in the Agreement says that ordering nothing terminates the Agreement, because no language in the Agreement says that Miller needed to send a written demand for termination once it stopped ordering, and because Miller did not breach the implied covenant of good faith and fair dealing by not sending the written demand, Count II will be dismissed.

### D.

In Count III, Silver Foam claims that Miller breached the agreement by not paying the penalty clause amounts in Schedules C and D. This count will be dismissed because the penalty clauses were never triggered.

21

The penalty clauses can be triggered in two ways. The first trigger was discussed in the prior section: Miller terminates the Agreement early by delivering a written demand for termination without cause. As explained, Miller never did this, and the Agreement did not require Miller to do this. The penalty clause provisions can also be triggered via § 2(a)(ii). (Agreement § 2(c).) In turn, § 2(a)(ii) refers to a default under § 2(d). And, in further turn, § 2(d) provides for three types of default: bankruptcy, past due payment, and "the failure to perform a material term." Although Silver Foam claims Miller failed to perform a material term, it asserts only two failures: buying nothing and not sending a written demand for termination. (*See* ECF No. 1, PageID.14.) But, as explained, it is not plausible that Miller breached by reducing its requirements to zero, and it is not plausible that Miller breached by not sending a written demand for termination.

Because the penalty provisions were never triggered, Miller did not breach by not paying Silver Foam the amounts provided by those provisions. Count III will be dismissed.

### E.

Count V is a claim of promissory estoppel. (Silver Foam has withdrawn Count IV. (ECF No. 17.)) Miller argues that because an enforceable contract governed its use of Silver Foam's co-packing and repalletization services, there is no room for a quasi-contract theory, i.e., Silver Foam cannot pursue a claim of promissory estoppel. (*See* ECF No. 12, PageID.81–82.)

The law governing this in-the-alternative situation is well settled. When, as here, there is an express contract with an integration clause that governed the parties' transaction, a contracting party cannot also pursue a promissory estoppel claim based on that same transaction. *See Costella v. City of Taylor*, No. 326589, 2016 WL 4375657, at *3 (Mich. Ct. App. Aug. 16, 2016); *Reinhart v. Cendrowski Selecky, P.C.*, No. 239540, 2003 WL 23104222, at *9 (Mich. Ct. App. Dec. 30, 2003). But the Federal Rules of Civil Procedure allow a plaintiff to pursue inconsistent theories.

*See Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 796 (6th Cir. 2016). So a plaintiff can plead an enforceable contract and, in the alternative, promissory estoppel. *See id.* But once a court (as a matter of law in deciding a motion) or a jury (at trial) "concludes that an enforceable contract exists and the performance that creates the consideration for the contract is the same performance that evidences detrimental reliance in a promissory estoppel claim," then the promissory estoppel claim must be dismissed. *Raby v. Bd. of Trustees of Police & Fire Ret. Sys. of City of Detroit*, No. 293570, 2011 WL 921645, at *3 (Mich. Ct. App. Mar. 17, 2011); *see also Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 182 (6th Cir. 1996) (finding, where defendant had "admitted the existence of a contract solely for the purposes of summary judgment" and might later contest the existence, plaintiff could keep its promissory estoppel claim).

In the typical in-the-alternative scenario, the defendant argues that there was no contract. And in response, the plaintiff argues that there was a contract (and the defendant breached it). Until this dispute is resolved, the plaintiff is allowed to keep its promissory estoppel claim as a backup.

This case does not present this typical scenario. Citing the complaint, Miller says, "The Service Agreement is a valid and enforceable contract." (ECF No. 12, PageID.65; *see also* ECF No. 12, PageID.82 ("SABMiller does not dispute the existence of the Service Agreement[.]").) And Silver Foam repeatedly says that the Agreement is a requirements contract (and Miller breached). (*E.g.*, ECF No. 1, PageID.10.) So both the plaintiff and the defendant agree that there was an enforceable contract governing Miller's use of Silver Foam's services to co-pack and repalletize beer. As such, it seems that there is no basis for a promissory estoppel claim.

Take a closer look, says Silver Foam. Silver Foam asserts that a careful inspection of Miller's interpretation of the Agreement reveals that Miller is, in fact, asserting that there was no valid contract. Under Miller's interpretation, the Agreement merely set terms (pricing and the like)

23

*if* Miller used Silver Foam's services. (*See* ECF No. 12, PageID.72; ECF No. 20, PageID.169.) Silver Foam argues that if Miller is correct, then Miller had no obligations under the Agreement. (ECF No. 15, PageID.139.) And, says Silver Foam, if Miller had no obligations under the Agreement, the Agreement lacked mutuality of obligation. (*Id.*) It follows, says Silver Foam, that there would not be an enforceable contract, and it should be able to keep its promissory estoppel claim. (*Id.*)

The Court is not persuaded. First off, "[t]o survive a motion to dismiss, a *complaint* must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (internal quotation marks omitted). Nowhere in the complaint—even in the alternative promissory estoppel count—is there an assertion that there was not an enforceable contract. There is not even a statement like, "should Miller argue or should the Court find that there is not an enforceable contract, then Miller is liable under the doctrine of promissory estoppel." All that is pled is a valid contract. And so purely as a matter of pleading, Silver Foam's promissory estoppel claim should be dismissed.

Further, Silver Foam has not convinced the Court that it could cure that pleading defect. Even under Miller's interpretation of the Agreement, Miller committed itself to paying the prices set out in the Agreement (and to complying with the Agreements other obligations) whenever it used Silver Foam's services. Silver Foam has not given any legal reason the parties could not agree to terms that would govern any orders in the next five years without also committing to actually place orders. If Silver Foam's point is that it was obligated to perform under the Agreement while Miller was not, Silver Foam has identified no language in the Agreement requiring it to do anything before Miller placed an order. The Agreement instead provides that Silver Foam "intends to invest" in the automation equipment, and that "upon installation" of that equipment, the pricing in

24

Schedule A would shift to the pricing in Schedule B (and early-termination penalties would come into play as well). Indeed, Silver Foam did not install (or, at least, finish installing) the automation equipment until 17 months after the Agreement was signed. (*Compare* ECF No. 1, PageID.8, *with* ECF No. 21-1, PageID.176.)

Further, one case cited by Miller suggests that even if the Agreement lacked mutuality of obligation, the parties' subsequent performance cured that defect. In *J&B Sausage Co.* v. *Department of Management & Budget*, Michigan's Department of Education entered into a contract with J&B, a pork-processing company. Under the contract, the Department would have raw "pork picnic" (pork shoulder) delivered to J&B, J&B would process the picnic into sausage rolls, and then J&B would deliver the rolls to the Department (presumably for school lunches). No. 259230, 2007 WL 28409, at *1 (Mich. Ct. App. Jan. 4, 2007). The contract stated in part, "If as in the past, Pork Picnics are purchased, the contractor shall be responsible for processing the Pork Picnics according to the attached requirements. *The state is not obligated to request processing in these amounts or any other quantities*." *Id.* at *3 (emphasis added). Things went awry, and J&B sued. The Michigan Court of Appeals stated that the contract "makes it clear that defendants were not obligated to request *any* pork processing from plaintiff, in amounts estimated or otherwise." *Id.* The court found that the plain language of the contract "vitiate[d] any claim that defendants were obligated to employ plaintiff's processing services at all." *Id.* Then, in a footnote, the court explained that this interpretation of the contract did not mean that there was no enforceable contract: "The above-quoted language [from the contract] . . . might appear to render the parties' agreement an illusory promise; defendants were not obligated to do anything in consideration of plaintiff's promise to process received pork. . . . Because, however, defendants allegedly ordered that USDA pork be delivered to plaintiff for processing, supplying the necessary

consideration, an enforceable agreement exists based upon this course of performance." *Id.* at *3 n.1. That reasoning seems to fit here: for five months Miller used Silver Foam's co-packing and repalletization services, and as far as the Court can tell, Miller paid Silver Foam for those services as set out in the Agreement. (*See* ECF No. 1, PageID.8 ("The parties performed under the Agreement without incident until in or around October, 2016.").)

In sum, given that Silver Foam did not plead that there was not an enforceable contract, that both sides claim that an enforceable contract governed their transactions, and that it is questionable that Silver Foam could plead that there was not an enforceable contract, Silver Foam's promissory estoppel claim will also be dismissed.

## F.

That almost wraps things up. But in a single line in its response brief, Silver Foam says that if this Court finds that it has not stated a claim upon which relief may be granted, it would like leave to amend. (ECF No. 15, PageID.141.)

The Court will not grant Silver Foam leave to amend. Motions cannot be made in a response brief, E.D. Mich. Elec. Filing Policies and Proc. R5(f), and certainly not the one-line variety, *Youngblood v. Bd. of Commissioners of Mahoning Cty., Ohio*, — F. App'x —, No. 19-3877, 2021 WL 613781, at *3 (6th Cir. Feb. 17, 2021). And even if the Court were to overlook that procedural defect, the Court would not grant leave. Silver Foam had a chance to review Miller's motion to dismiss and thus was given fair warning about the sufficiency of its complaint. Yet it declined the opportunity to amend its complaint. *See* Fed. R. Civ. P. 15(a)(1)(B). And from the very outset of this case, Silver Foam took the position that the Agreement was a requirements contract. (ECF No. 1, PageID.7.) But for whatever reason, Silver Foam declined to address the plethora of case law providing that a buyer may set its requirements to zero. Now that the Court

26

has gone through all the trouble of addressing it, it simply would not be a good use of the public's judicial resources for this case to start all over. *See United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 918 n.2 (6th Cir. 2017) ("Where parties have fully argued the merits of a 12(b)(6) motion to dismiss and the district court has duly considered those arguments and issued an opinion resolving the motion, it is a stretch to say justice requires granting leave to cure the complaint's deficiencies as identified in adversarial pleadings and the district court's order[.]"); *cf. Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 616 (6th Cir. 2010) ("If a permissive amendment policy applied after adverse judgments, plaintiffs could use the court as a sounding board to discover holes in their arguments, then reopen the case by amending their complaint to take account of the court's decision." (internal quotation marks omitted)). So the Court will not grant leave to amend.

## IV.

For the reasons given, Miller's motion (ECF No. 12) is GRANTED and Silver Foam's complaint is DISMISSED WITH PREJUDICE.

SO ORDERED.

Dated: March 8, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

# APPENDIX

## SERVICE AGREEMENT

This Service Agreement (the "Agreement"), dated as of the 18th day of December, 2014, is by and between SILVER FOAM REDISTRIBUTION CENTER and SABMILLER CANADA

## RECITALS

WHEREAS, SABMILLER CANADA wishes to receive certain services from SILVER FOAM REDISTRIBUTION CENTER, and SILVER FOAM REDISTRIBUTION CENTER is willing to provide such services to SABMILLER CANADA, all as specified below,

WHEREAS, SILVER FOAM REDISTRIBUTION CENTER operates a Foreign Trade Zone (FTZ) warehouse in Jackson, Michigan,

WHEREAS, SILVER FOAM REDISTRIBUTION CENTER will establish a FTZ warehouse in Indianapolis, Indiana,

WHEREAS, SABMILLER CANADA wishes to employ SILVER FOAM REDISTRIBUTION CENTER to assist with the importation of Beer Brands into Canada, and

WHEREAS, SABMILLER CANADA wishes SILVER FOAM REDISTRIBUTION CENTER to

- receive Beer Brands from Breweries,
- palletize the Beer Brands on pallets to SABMiller Canada configurations as required,
- place the received Beer Brands in storage,
- provide co-packing service for the Beer Brands as required by SABMiller Canada,
- accept, pick and ship orders of the Beer Brands on Liquor Board or SABMILLER CANADA designated carriers,
- store and return kegs and pallets to source brewery(s)

(Collectively, the "Services")

NOW THEREFORE, in consideration of the foregoing the mutual promises herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree to the following provisions:

Section 1.    Services.

(a)    SABMILLER CANADA desires to purchase from SILVER FOAM REDISTRIBUTION CENTER and SILVER FOAM REDISTRIBUTION CENTER desires to provide to SABMILLER CANADA each of the Services as more fully set forth on Schedule A attached hereto.

1

(b)      In the event that SABMILLER CANADA requests, and SILVER FOAM REDISTRIBUTION CENTER elects in its discretion to provide, any support or service not expressly provided for on Schedule A, SABMILLER CANADA and SILVER FOAM REDISTRIBUTION CENTER shall agree upon an arm's length fee for such support or service by SILVER FOAM REDISTRIBUTION CENTER in providing such support or service.  The terms of this Agreement shall apply to the provision of any such additional support or service and such additional support or service shall be added to Schedule A by amendment thereto or restatement thereof.

(c)      SILVER FOAM REDISTRIBUTION CENTER has indicated it intends to invest in material handling automation equipment.  Services currently included in Schedule A will transition to volume based pricing as set forth on Schedule B upon installation of the material handling automation equipment at the FTZ locations.

(d)      SABMILLER CANADA reserves the right to have priority access to the material handling automation equipment at the FTZ locations upon installation by SILVER FOAM REDISTRIBUTION CENTER.

(e)      SABMILLER CANADA and SILVER FOAM REDISTRIBUTION CENTER will meet yearly by January 30th of each year to align on forecasted volumes and the pricing scale to utilize for the new fiscal year as contained in Schedule B, upon installation of the material handling automation equipment at the FTZ locations.

Section 2.      Term and Termination of Agreement; Default.

(a)      The term ("Term") of this Agreement shall commence on the date hereof and continue until, the earliest of the following to occur:

(i) the mutual written agreement of the parties to terminate this Agreement; (ii) the occurrence and continuation of a Default (as hereinafter defined) by one party, pursuant to Section 2(d); (iii) the delivery by either party of a written demand for termination of this Agreement without cause, provided such demand shall not be effective for at least (30) days following its delivery to either party pursuant to section 10(b), and 2(c); or (iv) March 31, 2019, unless extended pursuant to Section 2(b).

(b)      The Agreement will expire on March 31, 2019 and renew upon mutual written agreement of the parties.

(c)      After installation of material handling automation equipment by SILVER FOAM REDISTRIBUTION CENTER in their FTZ location(s), penalty clauses for early termination by SABMILLER CANADA as set forth in Schedule C & Schedule D will survive in the event of a termination effectuated by SABMILLER CANADA, and only SABMILLER CANADA, pursuant to Section 2(a)(iii) or a termination effectuated by SILVER FOAM, and only SILVER FOAM, pursuant to Section 2(a)(ii) default by SABMILLER CANADA.

(d)      A party shall be deemed to be in default ("Default") hereunder upon the occurrence of any one or more of the following events with respect to it:

2

(i)   the making of any general assignment or arrangement for the benefit of creditors, the filing of a voluntary or involuntary petition in bankruptcy by or against such party under any bankruptcy or insolvency law or similar proceeding, the appointment of a trustee or receiver or the commencement of a similar proceeding to take possession of, or the attachment or other judicial seizure of all or substantially all of such party's assets, or the taking by such party of any action in furtherance of the foregoing;

(ii)   in the case of SABMILLER CANADA, its failure to make any payment when due hereunder, if such failure continues for (30) days and SILVER FOAM REDISTRIBUTION CENTER provides written notice to SABMILLER CANADA pursuant to section 10(b);

(iii)   the failure to perform a material term under this Agreement if such failure continues for (150) days after receipt of written notice from the other party of such failure.

     Section 3.    Fees For Services.  As compensation for the Services to be provided by SILVER FOAM REDISTRIBUTION CENTER hereunder, SABMILLER CANADA shall pay to SILVER FOAM REDISTRIBUTION CENTER the agreed upon arm's length fee for each such Service as set forth on Schedule A.  Payment on any invoice sent pursuant hereto shall be due within thirty (30) business days from the date of receipt.  All such invoice amounts shall be paid in USD, by wire transfer or cheque, to an account or payee address previously designated by SILVER FOAM REDISTRIBUTION CENTER.

     Section 4.    Mutual Confidentiality.  Except as provided below, all information disclosed between the parties pursuant to this Agreement, including information relating to third parties, is deemed confidential ("Confidentiality Information").  A party receiving Confidential Information (the "Confidential Information Receiver") will not use such information for any purpose other than for which it was disclosed and shall prevent the disclosure to third parties of any and all Confidential Information for a period of two (2) years from the expiration or earlier termination of this Agreement; provided, however, a party may disclose Confidential Information if required by law, rule or regulation or judicial process, or if required by any state, federal or foreign authority. A party required to disclose Confidential Information shall request confidential treatment of such Confidential Information to the extent permitted by law and, insofar as practicable, the party will notify the other party promptly upon obtaining knowledge of such request or demand. Notwithstanding the foregoing, the following information shall not be deemed to be "Confidential Information" for purposes hereof:  (i) information that is already in the Confidential Information Receiver's possession at the time of disclosure thereof; (ii) information that is or subsequently becomes part of the public domain through no action of the Confidential Information Receiver; (iii) information that is subsequently received by the Confidential Information Receiver from a third party having no obligation of confidentiality to the party disclosing the Confidential Information; or (iv) information that is disclosed to third parties as required by law.

EXHIBIT A

Section 5.   Insurance.   SILVER FOAM REDISTRIBUTION CENTER  hereby covenants to and in favor of SABMILLER CANADA as follows:

(a)   SILVER FOAM REDISTRIBUTION CENTER shall effect and maintain with a reputable insurer having assets of not less than $500 million CDN, appropriate insurance naming SABMILLER CANADA as named insureds providing coverage of at least $1 million for any one occurrence arising with respect to every such claim, demand, loss or expense and all damages and costs related to the loss, destruction or damage of SABMILLER products while in the care and control of SILVER FOAM REDISTRIBUTION CENTER; and

(b)   On request of SABMILLER CANADA will furnish SABMILLER CANADA with evidence of such insurance.

Section 6.   Indemnification.   SILVER FOAM REDISTRIBUTION CENTER  agrees to indemnify SABMILLER CANADA, its subsidiaries and affiliates and their respective directors, officers, agents and employees (each, an "Indemnified Party") for, and to hold each Indemnified Party harmless from and against, any and all liabilities (including reasonable attorneys' fees and legal expenses) arising or resulting from the negligence, willful misconduct or willful failure to perform of SILVER FOAM REDISTRIBUTION CENTER  in the delivery, provision or use of any Service provided under or covered by this Agreement.

Section 7.   Risk of Loss – Shrinkage and Product Damage.   While SILVER FOAM REDISTRIBUTION CENTER acknowledges title to the product remains with SABMILLER CANADA, SILVER FOAM REDISTRIBUTION CENTER is liable for any shrinkage or product damage that occurs while the product is in the possession of SILVER FOAM REDISTRIBUTION CENTER. Product that is damaged prior to receipt at SILVER FOAM REDISTRIBUTION CENTER is the responsibility of SABMILLER CANADA and not SILVER FOAM REDISTRIBUTION CENTER.

Section 8.   Independent Contractor.   Neither SILVER FOAM REDISTRIBUTION CENTER nor its employees, agents or any other person SILVER FOAM REDISTRIBUTION CENTER may retain or contract with to perform services on its behalf (this latter group shall hereinafter be referred to as "independent contractors") shall be deemed employees of SABMILLER CANADA.  SILVER FOAM REDISTRIBUTION CENTER shall be solely responsible for compensating its employees, agents and independent contractors. Unless otherwise expressly agreed to by SABMILLER CANADA in writing, SILVER FOAM REDISTRIBUTION CENTER  shall not be SABMILLER CANADA's agent for any purpose whatsoever and shall not be authorized to act for, financially commit, speak for, or represent SABMILLER CANADA in any dealings with third parties.  SILVER FOAM REDISTRIBUTION CENTER shall not have the authority or right to incur obligations of any kind in the name of or for the account of SABMILLER CANADA, nor to commit or bind SABMILLER CANADA to any contract (other than this Agreement) and SILVER FOAM REDISTRIBUTION CENTER agrees that it neither has nor will give the appearance or impression of possessing any legal authority to bind or commit SABMILLER CANADA in any way (except to his commitments hereunder).

4

Section 9.    Warranties. SILVER FOAM REDISTRIBUTION CENTER warrants that the services to be performed will not violate the terms of any confidentiality agreement currently in effect between SILVER FOAM REDISTRIBUTION CENTER and any other person, firm or entity. SILVER FOAM REDISTRIBUTION CENTER further warrants that it has the necessary expertise and is otherwise able and willing to provide the services and successfully complete the projects contemplated in this Agreement. All services shall be performed in a workmanlike manner by qualified personnel. SILVER FOAM REDISTRIBUTION CENTER and its personnel shall comply with all applicable statutes, rules and regulations governing all aspects of the services performed under this Agreement.

Section 10.    General Provisions.

(a)    Execution in Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

(b)    Notices. All notices and other communications among the parties shall be in writing and shall be deemed to have been duly given (i) when delivered in person, (ii) upon receipt after being sent by a reputable, nationally recognized overnight courier, or (iii) when delivered electronically or by telecopy and promptly confirmed automatically or by telephone confirmation.

(c)    Amendments. This Agreement may only be amended or modified by a written instrument executed by both of the parties hereto.

(d)    Waiver. No waiver shall be effective unless in writing and signed by the party against whom the waiver is to be effective. No waiver by any party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

(e)    Entire Agreement. The Agreement constitutes the entire contract among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings between the parties hereto, oral and written, with respect to the subject matter hereof.

(f)    Governing Law. This Agreement shall be construed in accordance with the state of Michigan law.

(g)    No Third-Party Beneficiaries. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any person, other than the parties hereto, any right or remedies under or by reason of this Agreement.

(h)    Assigns. With the exception of assignments to affiliates, subsidiaries or other entities under control of a party hereto or under common control with a party hereto, this Agreement may not be transferred by either party without the prior written consent of the other party.

EXHIBIT A

IN WITNESS WHEREOF, each of the parties hereto has duly executed and delivered this Agreement as of the date first above written.

**SILVER FOAM REDISTRIBUTION CENTER:**

By: _____

Name: JOSEPH WHITE

Title: V.P.

By: _____

Name: _____

Title: _____

**SABMILLER CANADA:**

By: _____

Name: Stephen Rogers

Title: Vice President

By: _____

Name: _____

Title: _____

6

EXHIBIT A

## SCHEDULE A

Silver Foam to provide the following basic services to SABMiller Canada in Jackson, MI

| SERVICES | SERVICE FEE |
|---|---|
| Full Good/Dunnage Pallet Handling <ul><li>Includes inbound receiving, storage, outbound shipments and documentation</li><li>Includes pallet shrink wrap and tying of top tier</li></ul> | $5.70 per Inbound Pallet (Bottles, Cans & Empty Kegs)<br><br>$8.00 per Inbound Pallet (Full Kegs) |
| Dunnage Return Processing | $125.00 per trailer |
| Repalletization | $0.24 per Case ( pre installation of automation equipment) |
| Keg Handling <ul><li>Stand-up full keg</li><li>Lay down empty keg</li></ul> | $0.65 per Keg ($0.40 Full + $0.25 Empty) |
| T&E Bond electronic filing | $30.00 per Outbound Load |

Silver Foam to provide the following co-pack services to SABMiller Canada in Jackson, MI

| SERVICES | SERVICE FEE |
|---|---|
| Remove Hi-Cone <ul><li>473ML Cans</li></ul> | $0.10 per case |
| Apply Shrink Film <ul><li>LCBO<ul><li>All packages in tray</li></ul></li><li>Rest of Canada<ul><li>473ML (16oz) Cans</li></ul></li></ul> | $0.36 per Case |
| Apply Glue Dots <ul><li>LCBO<ul><li>All packages that do not require shrink film</li></ul></li></ul> | $0.03 per Case |
| MGD 18 BTLS 355ML <ul><li>LCBO<ul><li>Open carton</li><li>Insert partition</li><li>Re-glue carton</li></ul></li></ul> | $0.40 per Case |
| OLDE ENGLISH <ul><li>Canada<ul><li>Build carton</li><li>Insert 8 bottles</li><li>Insert partition</li><li>Glue top flaps</li><li>Date stamp</li></ul></li></ul> | $0.80 per Case |
| Insert Duo Stack 355ML cans into Preformed Tray <ul><li>LCBO</li></ul> | $0.10 per Case |
| Insert 2x12 355ML cans into Preformed Tray <ul><li>Canada</li></ul> | $0.10 per Case |

(1) All rates are in USD

7

## **SCHEDULE B**

Costing for repalletization in Jackson, MI after installation of automation equipment.

|        | Automated Repalletization Case Rate | Estimated Case Volume |
|--------|-------------------------------------|-----------------------|
| Year 1 | $0.24                               | 1,635,822             |
| Year 2 | $0.21                               | 2,202,893             |
| Year 3 | $0.20                               | 3,240,729             |
| Year 4 | $0.19                               | 4,115,636             |
| Year 5 | $0.18                               | 4,729,345             |

(1)  All rates are in USD

Costing for repalletization in Indianapolis, IN after installation of automation equipment.

| Revenue Structure | |
|-------------------|---|
| Yearly Inbound Pallet Thresholds | Yearly Cost/Inbound Pallet |
| Year 1            | $20.00 |
| < 55000           | $15.00 |
| 55000 – 80000     | $14.25 |
| > 80000           | $12.00 |

(1)  All rates are in USD

8

EXHIBIT A

## SCHEDULE C

Cancellation Penalty Clause in Jackson, MI

**Depreciation Schedule**
Cost: $817,065.00, Salvage: $15,000.00, Life: 15 years
Convention: Full-Month, First Year: 12 months

| Year | Book Value Year Start | Depreciation Expense | Accumulated Depreciation | Book Value Year End |
|---|---|---|---|---|
| 2015 | $817,065 | $53,471.00 | $53,471 | $763,594 |
| 2016 | $763,594 | $53,471.00 | $106,942 | $710,123 |
| 2017 | $710,123 | $53,471.00 | $160,413 | $656,652 |
| 2018 | $656,652 | $53,471.00 | $213,884 | $603,181 |
| 2019 | $603,181 | $53,471.00 | $267,355 | $549,710 |
| 2020 | $549,710 | $53,471.00 | $320,826 | $496,239 |
| 2021 | $496,239 | $53,471.00 | $374,297 | $442,768 |
| 2022 | $442,768 | $53,471.00 | $427,768 | $389,297 |
| 2023 | $389,297 | $53,471.00 | $481,239 | $335,826 |
| 2024 | $335,826 | $53,471.00 | $534,710 | $282,355 |
| 2025 | $282,355 | $53,471.00 | $588,181 | $228,884 |
| 2026 | $228,884 | $53,471.00 | $641,652 | $175,413 |
| 2027 | $175,413 | $53,471.00 | $695,123 | $121,942 |
| 2028 | $121,942 | $53,471.00 | $748,594 | $68,471 |
| 2029 | $68,471 | $53,471.00 | $802,065 | $15,000 |

| Cancellation Penalty Clause | | | | |
|---|---|---|---|---|
| Contract Duration | Equipment Penalty | Start-up Penalty | Equipment Depreciation | Total |
| 1 Year | $653,652.00 | $96,120.00 | $53,471 | $696,301.00 |
| 2 Years | $490,239.00 | $72,090.00 | $106,942 | $455,387.00 |
| 3 Years | $326,826.00 | $48,060.00 | $160,413 | $214,473.00 |
| 4 Years | $163,413.00 | $0.00 | $213,884 | $0.00 |

Penalty = Equipment Penalty + Start-up Penalty – Equipment Depreciation
(1) All rates are in USD

9

EXHIBIT A

## SCHEDULE D

Cancellation Penalty Clause in Indianapolis, IN

**Depreciation Schedule**

Cost: $596,171.00, Salvage: $10,000.00, Life: 15 years
Convention: Full-Month, First Year: 12 months

| Year | Book Value Year Start | Depreciation Expense | Accumulated Depreciation | Book Value Year End |
|------|------|------|------|------|
| 2015 | $596,171 | $39,078.07 | $39,078 | $557,093 |
| 2016 | $557,093 | $39,078.07 | $78,156 | $518,015 |
| 2017 | $518,015 | $39,078.07 | $117,234 | $478,937 |
| 2018 | $478,937 | $39,078.07 | $156,312 | $439,859 |
| 2019 | $439,859 | $39,078.07 | $195,390 | $400,781 |
| 2020 | $400,781 | $39,078.07 | $234,468 | $361,703 |
| 2021 | $361,703 | $39,078.07 | $273,546 | $322,625 |
| 2022 | $322,625 | $39,078.07 | $312,625 | $283,546 |
| 2023 | $283,546 | $39,078.07 | $351,703 | $244,468 |
| 2024 | $244,468 | $39,078.07 | $390,781 | $205,390 |
| 2025 | $205,390 | $39,078.07 | $429,859 | $166,312 |
| 2026 | $166,312 | $39,078.07 | $468,937 | $127,234 |
| 2027 | $127,234 | $39,078.07 | $508,015 | $88,156 |
| 2028 | $88,156 | $39,078.07 | $547,093 | $49,078 |
| 2029 | $49,078 | $39,078.07 | $586,171 | $10,000 |

| Cancellation Penalty Clause | | | | | |
|------|------|------|------|------|------|
| Contract Duration | Equipment Penalty | Start-up Penalty | Lease | Equipment Depreciation | Total |
| 1 Year | $476,936.80 | $180,400.00 | TBD | $39,078.00 | $618,258.80 |
| 2 Years | $357,702.60 | $135,300.00 | TBD | $78,156.00 | $493,002.60 |
| 3 Years | $238,468.40 | $90,200.00 | TBD | $117,234.00 | $328,668.40 |
| 4 Years | $119,234.20 | $0.00 | TBD | $156,312.00 | $0.00 |

Penalty = Equipment Penalty + Start-up Penalty + Lease − Equipment Depreciation

(1) All rates are in USD

10

EXHIBIT A